### PHILO W. ALDEN *vs.* LUCIUS B. MARSH.

Evidence that at the time of the mortgage of a stock of goods the mortgagee knew that the mortgagor was intemperate in his habits and neglected his business is competent in support of the allegation that the mortgage was made and received in fraud of the insolvent law.

At the trial of an action to test the validity of a mortgage, by a tailor in the country, of his stock of goods, it appeared that he made it as security for money which he borrowed at the time from the plaintiff, alleging need of it to pay bills coming due at Boston, and that he absconded within two days afterwards.  The defendant, who was a wholesale dealer at Boston, and was assignee of the tailor's estate in insolvency, testified that the tailor's credit was bad for several months previous to the date of the mortgage, but called no other witnesses to that point; and testified also, from his experience in trade for more than thirty years, that it was not in the usual line of business for retail dealers with unincumbered stocks to mortgage them; which was the only direct evidence on the subject of such a usage.  *Held*, that it was properly left to the jury to determine, upon all the evidence, whether the mortgage was made in the usual and ordinary course of business, and whether the plaintiff had reasonable cause to believe that it was made in fraud of the insolvent law.

TORT for conversion of a stock of tailors' goods and the store fixtures.  The plaintiff claimed under a mortgage, dated September 5, 1866, from the firm of Hibbard & Cosgrove.  The defendant justified as assignee in insolvency of that firm, and alleged that the mortgage was fraudulent under the insolvent law.

At the trial in the superior court, before *Wilkinson*, J., the facts with regard to the mortgage appeared as follows: Up to September, 1866, Hibbard & Cosgrove had been in business as tailors at Springfield for about eighteen months, during all which time the plaintiff had known Hibbard and was in the

Alden *v.* Marsh.

habit of visiting his store and was a customer of the firm. On the evening of September 3 he was at the store, when Hibbard asked him for a loan of money, saying he needed it to pay bills coming due at Boston which he could not meet by collections without crowding his customers more than he wished, but that there were accounts enough on the books to pay these bills, and that he was good. The plaintiff then replied that he had no money to lend. The next evening Hibbard renewed the request, when the plaintiff told him that he had a note for a thousand dollars, not yet due, which he would lend to him if he would give an indorser. The morning after this Hibbard brought to him a note for a thousand dollars, signed by himself with the name of the firm, but without an indorser; and a mortgage, signed in the same way, covering all the stock of goods and store fixtures, to secure the note. The plaintiff accepted these and made the loan. He had never lent the firm any money before; and he never saw Hibbard after that morning. Within two days afterwards Hibbard absconded from Springfield, and has not returned. Cosgrove did not know of the plaintiff's loan, or of the mortgage, till a week after Hibbard's disappearance. His part of the business was to obtain orders and cut garments, Hibbard managing the financial affairs of the firm. No debts were contracted after Hibbard absconded; and, on September 19, proceedings in insolvency were instituted against the firm, and the defendant was duly appointed assignee at the first meeting of creditors. The financial condition of the firm was found to be that, independently of the plaintiff's claim, it owed about nine thousand dollars, a great part of which was long overdue; and that its assets were accounts due to the firm to the amount of less than seventeen hundred dollars, and also stock and store fixtures of the value of more than four thousand dollars, being the same described in the mortgage to the plaintiff. Several business men of Springfield, among them the cashier of the bank where Hibbard & Cosgrove kept their accounts, testified that the standing of the firm was perfectly good prior to the execution of the mortgage, but on cross-examination it appeared that none of these witnesses had occasion to inquire

about it within six months prior to September 19. The defendant testified, himself, that it was bad for several months prior to that date, but called no other witnesses to that point; and the defendant testified further that he was, and had been for more than thirty years, an importer and jobber in Boston, dealing with all parts of the country, and that it was not in the usual line of business for retail dealers with unincumbered stocks to mortgage them.

The plaintiff was a witness, and on cross-examination the defendant asked him whether Hibbard was intemperate in his habits, and whether he neglected his business. No objection was taken to the form of the questions, but the judge refused to admit answers to them.

The defendant asked the judge to instruct the jury that, under the circumstances shown in testimony, the mortgage was a conveyance not made in the ordinary course of business of the debtors; and that the statement of Hibbard that he needed money, which he had not, in order to pay his bills in Boston as they became due, and his offer to mortgage the firm's stock of goods to raise the means to pay those bills, were evidence from which the plaintiff had reasonable cause to believe that the conveyance was made with intent to evade the provisions of the insolvent law; but the judge refused so to instruct, and did instruct that it was a question of fact for the jury to determine, whether the mortgage was made in the usual and ordinary course of business, and whether the plaintiff had reasonable cause to believe that it was intended in fraud of the insolvent law.

A verdict was found for the plaintiff; and the defendant alleged exceptions.

*A. L. Soule,* for the defendant.

*G. Wells,* (*N. A. Leonard* with him,) for the plaintiff.

CHAPMAN, J. The fact that Hibbard was intemperate in his habits, and neglected his business, would be competent evidence having some tendency to prove that the firm was insolvent. It tended to prove the existence of a cause of which insolvency would be the natural and probable effect. In some cases such evidence might be very slight; but the jury would be the judges

of its weight. The fact that the plaintiff lived near by, that he had known Hibbard during his whole residence in Springfield, and was in the habit of being in and out of his store and of having his clothes made there, would be competent evidence, in connection with the other evidence in the case, having some tendency to prove that he had knowledge of Hibbard's habits. Its weight would depend upon particular circumstances, and it would be weighed by the jury. It should have been admitted. *Simpson* v. *Carleton*, 1 Allen, 109. *Bartholomew* v. *McKinstry*, 6 Allen, 567.

But it was properly left to the jury to determine whether the mortgage to the plaintiff was made in the usual and ordinary course of business, and whether the plaintiff had reasonable cause to believe it was intended to be made in fraud of the insolvent law. As the plaintiff was not a preëxisting creditor, it was not made for the purpose of giving him a preference; and as it was professedly made by Hibbard to enable him to meet bills which were coming due, and which he could not meet without crowding his customers more than he wished to do, we cannot judicially see that there was any thing in it of an unusual character, or calculated to excite suspicion in the mind of the plaintiff. It is unlike the case of *Nary* v. *Merrill*, 8 Allen, 451. The first exception must be sustained; and the second overruled.