## THE CLARA DAVIDSON v. THE VIRGINIA.

## THE BALTIMORE STEAM-PACKET Co. v. THE CLARA DAVIDSON.

*(District Court, E. D. Virginia. July 10, 1885.)*

COLLISION—SAIL-VESSEL APPROACHED BY STEAMER—CHANGE OF COURSE—TACK-ING.

If a sail-vessel is tacking against the wind, where there is sufficient sea-room to keep on, she is not at liberty to change her tack or course when approached by a steamer which is trying to keep out of her way. Nothing but urgent necessity will excuse a sail-vessel for luffing and changing her course when on a tack, and approached by a steamer.

In Admiralty. Cross-libels.

*White & Garnett*, for the Baltimore Steam-packet Company.

*Sharp & Hughes*, for the Schooner.

HUGHES, J. The collision complained of by the libelants in these cases occurred in Elizabeth river, off Lambert's point, a mile and three-quarters below Fort Norfolk, on the fifth of May last, shortly before 7 o'clock in the evening. The passenger steamer Virginia, a fast boat owned by the Baltimore Steam-packet Company, was on her regular trip down the river, bound for Baltimore. The schooner Clara Davidson was tacking up the river. She had been on a starboard tack from below to buoy 11, which is the black buoy just below Lambert's point. She had there luffed and got upon a port tack, heading W. by N. across the river, close-hauled, when her master saw the Virginia off Fort Norfolk moving down the river. When about two-thirds of the way across the river, the schooner hard starboarded and becketed her wheel, and changed her course, intending to bring up the channel, and at the same time, as her master testifies, to avoid grounding, and colliding with the schooner Rachel Seaman, which was lying at anchor on the western side of the channel. There were two other schooners at anchor on the western side of the channel, one of them near buoy 10, and another near buoy 12, which were a quarter of a mile apart. The wind was blowing a light breeze from about

south-west, and was a little baffling. The river off Lambert's point was 2,120 feet wide for 12 feet water, and 3,530 feet for 6 feet water. Taking the mean, I conclude that it was 3,100 feet for 8 feet water, or half a mile. The collision happened, therefore, not less than 1,000 feet from the western side of the 8-foot channel. The schooner was running light, and drew 5 feet water, exclusively of the center-board. From the time that the Davidson tacked at buoy 11 to the moment of collision was about five to six minutes. When the collision happened, the helmsman of the schooner had becketed his wheel and left it, and was assisting in shifting the boom from the port tack, until the collision happened. It is contended, on the part of the schooner that from this time to the moment of collision was a period of more than two minutes. If so, the helmsman of the schooner was all that while absent from his post; that is to say, was absent for more than two minutes before the collision.

The steamer Virginia had come down from off the Hospital light below Norfolk to buoy 12 at the rate of 13 miles an hour. On reaching this buoy, which was rather more than half a nautical mile (3,830 feet) from the place of collision, seeing the Clara Davidson and one or two other schooners in the channel below, she slowed down her speed to five or six miles an hour. The Clara Davidson and one of these other schooners were tacking at the time, in opposite directions, across the river. The Virginia accordingly determined, by slowing down, to pass under the stern of both vessels after they should leave space enough between them for that purpose. On nearing the Clara Davidson, after thus slowing down, the Virginia saw the Davidson change her course by making the maneuver in the channel of the river, which has been mentioned. The Virginia, being then close on the Davidson, immediately reversed her engine and backed her wheels; but at about the moment of succeeding in checking her headway, and before moving backwards, the schooner ran into her on her starboard bow or side.

Just above the place at which this collision occurred, the river makes a decided bend to eastward, so that a steamer moving north from above the bend appears to a vessel coming from below the bend to head across her bows. This fortuitous appearance of things must have caused the navigator of the Davidson to suppose that the Virginia was heading across her bows, and did create the like impression in some of the passengers and some of the crew of the steamer herself. I therefore do not think that the change of course which the Davidson ventured upon was a willful disregard of the rule of navigation requiring her to keep on, which should have governed her on the occasion. Be the reason of the change what it might, this change of course on the part of the schooner so demoralized the situation that the steamer at once reversed her engine and backed her wheels, as required in such an emergency, and came to a dead stand in her course. While the steamer was thus situated, the schooner, which was badly managed,

and had no one at the wheel, and was herself in an unmanageable condition, was driven upon the steamer in the manner that has been described.

The law governing this case is as follows: The rules of navigation provide (rule 20) that if two vessels, one of which is a sail-vessel and the other a steam-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel; and (rule 23) that the sail-vessel shall keep her course. In construing and obeying these rules (rule 24) due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary to avoid immediate danger.

In *The John L. Hasbrouck*, 93 U. S. 405, at page 405, the court say that "sail-vessels descending a river are not required to hold their course at the hazard of being grounded or shipwrecked by natural obstructions * * * when a steamer is approaching," etc.

In *The Illinois*, 103 U. S. 298, the chief justice says, in a case similar to the one at bar: "It was clearly a fault for the schooner to change her course unless there was a necessity for it. Mere convenience was not enough. * * * It is not found that the ice was so close under the port bow of the schooner as to make it dangerous for her to keep on as she was going until the steamer got by. * * * So far as the findings show, the way was open for some distance ahead, and the steamer had the right to assume she might keep her place in mid-channel and go on with safety."

On the condition of leading facts that have been shown above, the preliminary questions in this case are whether the schooner violated rule 23 of navigation, which required her to keep on in her course, upon a port tack, on the approach of the steamer; and, if so, whether there were any necessities of navigation controlling her sufficient to excuse the violation. It seems to have been assumed in the preparation of the evidence in this case that the answer to these questions would probably not be in favor of the schooner; and counsel have, with great industry, ingenuity, and ability, presented the court with voluminous evidence and elaborate argument addressed to questions of fault other than, and independent of, the preliminary questions which I have mentioned. But I do not find myself at liberty to ignore the inquiry whether a statutory rule of navigation was violated by the schooner. Those rules are the law of laws in cases of collision. They admit of no option or choice. No navigator is at liberty to set up his discretion against them. If these rules were subject to the caprice or election of masters and pilots, they would be not only useless, but worse than useless. These rules are imperative. They yield to necessity, indeed, but only to actual and obvious necessity. It is not stating the principle too strongly to say that nothing but imperious necessity or some overpowering *vis major* will excuse a sail-vessel in changing her course when in the presence of a steamer in mo-

tion; that is, obeying the duty resting upon it of keeping out of her way.

If the statutory rules of navigation were only optionally binding, we should be launched upon an unbounded sea of inquiry in every collision case, without rudder or compass, and be at the mercy of all the fogs and mists that would be made to envelope the plainest case, not only from conflicting evidence as to the facts, but from the hopelessly conflicting speculations and hypotheses of witnesses and experts as to what ought to or might have been done before, during, and after the event. The statutory regulations that have been wisely and charitably devised for the governance of mariners, furnish an admirable chart by which the courts may disentangle themselves from conflicting testimony and speculation, and arrive at just conclusions in collision cases.

That the Clara Davidson changed her course while the Virginia was approaching to pass her, is admitted; and yet it has not been shown that she was under the *necessity* of doing so. There was no danger of *grounding* by keeping on in her port tack. She had a thousand feet of eight-feet water before her, and no proof is adduced by a single witness that she would have run the least risk of grounding. Her master had seen the Virginia when off Fort Norfolk, more than a mile and a half distant. He had seen her again at buoy 12, when she slowed down from 13 to 6 miles an hour. He had thus had full notice of her approach in the channel, which he was crossing at the slow speed of less than four miles an hour. He had no right to presume that the steamer intended to cross his bows, as an excuse for changing his own course. He had no right to make any presumption that could exonerate himself from the duty of keeping on in his course. As already said, there was no danger of his running aground. If there was danger of his running upon the schooner Rachel Seaman, anchored ahead of him on the west side of the channel, no great harm could have resulted from such an encounter. He was moving against wind and tide at the slow pace of less than four miles an hour, and the other vessel was at anchor. A fender or two—the slightest precautions—would have prevented any possible harm to each of the schooners. There was no certainty of his striking the Rachel Seaman, and the encounter need not have been harmful. The mere possibility of a harmless encounter fell short—far short—of constituting such a *necessity* or *vis major* as is contemplated by the statutory rule of navigation, which, in extreme emergencies, and only in extreme emergencies, will excuse sail-vessels, when in the presence of approaching steamers, from keeping on in their course.

It is contended on the part of the Clara Davidson that more than two minutes elapsed from the time she began the maneuver for changing her course until the collision. If this had been so, she would certainly have had time to pass clear of possible collision with the Virginia by keeping on in her port tack. The Virginia had a right to presume

that the schooner would not change her course. She did so presume, and neared the schooner in that legitimate presumption. When she found that the schooner had unaccountably changed her course, and rendered a collision imminent, she did what the law requires her to do,—she immediately reversed her engine and backed on her wheels. I do not see that she was in fault in any particular. The schooner was in fault, and I will decree accordingly.